**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**MICHELLE G. WATTS**                                    **CIVIL ACTION**

**VERSUS**                                                        **NO. 21-2044**

**KILOLO KIJAKAZI,**                                    **SECTION "R" (3)**
**ACTING COMMISSIONER OF SOCIAL**
**SECURITY ADMINISTRATION**

**REPORT AND RECOMMENDATION**

Plaintiff, Michelle Watts, filed this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of the Commissioner denying her claims for supplemental security income payments ("SSI") under Title XVI of the Social Security Act ("the Act"). The matter has been fully briefed on cross-motions for summary judgment. The issues are thus ripe for review. For the following reasons, **IT IS RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, the Commissioner's cross-motion be **GRANTED**, and Plaintiff's case be **DISMISSED WITH PREJUDICE**.

## I.    BACKGROUND

On May 5, 2020, Michelle Watts ("Plaintiff") filed a Title XVI application for SSI, alleging disability beginning December 22, 2016, for "depression, anxiety, attention-deficit hyperactivity disorder [("ADHD")], learning disability, arthritis, stomach problems, carpal tunnel syndrome, bulging disc in her neck and back… and hiatal hernia." (Rec. Doc. No. 8, pp. 15, 20). At the hearing, Plaintiff amended her alleged onset date to May 5, 2020, the date of her application. *Id*. Her claim was denied initially on July 29, 2020, and upon reconsideration on November 16, 2020. *Id*. Plaintiff requested a hearing, which was held on May 26, 2021, before an administrative law judge ("ALJ"). *Id*. The ALJ issued an unfavorable decision finding that the Plaintiff was not disabled on July 14, 2021. *Id*. at 24.

1

The ALJ analyzed Plaintiff's claim pursuant to the five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v). At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 5, 2020, her amended onset date. (Rec. Doc. No. 8, p. 17). At the second step, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine and lumbar spine, bilateral carpal tunnel syndrome, bipolar disorder, depression, anxiety, and ADHD. *Id*. At the third step, the ALJ found that the impairment or combination of impairments failed to meet or equal a listed impairment for presumptive disability under the regulations. *Id*. at 18.

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except:

> [S]he can occasionally climb ramps and stairs, but she can never climb ladders, ropes or scaffolds. She can occasionally crouch and crawl. She can frequently balance, stoop and kneel. She can frequently reach overhead and frequently handle with her bilateral hands. She can perform simple and detailed tasks of 1-4 steps with routine supervision and make related judgments with superficial public contact. Work can be performed where interpersonal contact is routine but superficial, e.g. grocery checker. She can perform tasks that are no more complex than those learned by experience, with several variables and judgment within limits; and supervision required is little for routine tasks but detailed for non-routine tasks.

(Rec. Doc. No. 8, p. 19). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work as a housekeeping cleaner or door greeter. *Id*. at 22. At step five, upon consideration of testimony from the vocational expert, the ALJ found that Plaintiff was not disabled because she was capable of performing other jobs existing in significant numbers in the national economy, including document specialist, surveillance system monitor, and escort vehicle driver. *Id*. at 23. Accordingly, the ALJ found that Plaintiff was not under a "disability" as defined in the Act from May 5, 2020, through July 14, 2021, the date of her decision. *Id*. at 23-24.

On September 13, 2021, the Appeals Council denied a request to review the ALJ's decision, making the unfavorable decision the final decision of the Commissioner. (Rec. Doc. No.

10-1, p. 2). Plaintiff filed the present civil action to challenge that decision pursuant to 42 U.S.C. § 405(g).

## II.     LEGAL STANDARDS

Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied to evaluate the evidence. *See* 42 U.S.C. § 405(g); *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). Substantial evidence means more than a scintilla, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In other words, substantial evidence is "such relevant evidence as a responsible mind might accept to support a conclusion." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

Although a reviewing court must review the administrative record to ascertain whether substantial evidence supports the Commissioner's findings, it may not reweigh the evidence, try issues *de novo*, or substitute its own judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988). "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive, and the Commissioner's decision must be affirmed." *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (citing 42 U.S. § 405(g)). A reviewing court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland*, 771 F.3d at 923.

The ALJ has a duty to fully and fairly develop the facts relating to a claim for disability benefits. *See Ripley*, 67 F.3d at 557 (citing *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (per curiam); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). If this duty is not satisfied, the decision that results is not supported by substantial evidence. *See id*. However, the Court does not expect procedural perfection from the ALJ and will reverse as not supported by substantial

evidence only if the failure to develop the record prejudiced the plaintiff. *See Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012). In other words, the plaintiff "must show that he could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726, 728-29 (5th Cir. 1996).

## III.    ENTITLEMENT TO BENEFITS UNDER THE ACT

To be entitled to social security benefits, a claimant must show that she is disabled within the meaning of the Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). A claimant must show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501-404.1599 & Appendices, §§ 416.901t-416.988 (1995). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. *Id.* §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

In evaluating a disability claim, the Commissioner utilizes the five-step sequential process to determine whether: (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity. *See* 20 C.F.R. § 404.1520; *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007).

Under the first four steps of the analysis, the burden lies with the claimant to prove he has

a disability. *Leggett*, 67 F.3d at 564. Once the claimant satisfies his initial burden, the burden shifts to the Commissioner at step five to show that the claimant can perform other gainful employment in the national economy. *Greenspan*, 38 F.3d at 236. If the Commissioner shows that other jobs are available to the claimant, the burden of proof shifts back to the claimant to rebut such a finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

A claimant is considered disabled only if a physical or mental impairment is so severe that the claimant is unable to do not only previous work, but cannot, considering age, education and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if she applied for work. 42 U.S.C. § 1382(a)(3)(B). If the ALJ determines that a plaintiff is not disabled under Step V of the five-part test, the ALJ must establish that the claimant has a "residual functional capacity" (RFC), given the claimant's age, education, and past work experience, to perform other work available in the national economy. *Leggett v. Chater*, 67 F.3d 558, 564 n.11 (5th Cir. 1995). Step V also requires the Commissioner to use the medical-vocational guidelines to make a disability determination. *Id.* The four elements of proof weighed to determine whether evidence of disability is substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). The Commissioner, rather than the courts, must resolve conflicts in the evidence. *Id*.

## IV.    ISSUES ON APPEAL

    a.  Whether the ALJ erred in evaluating Plaintiff's RFC by failing to include limitations she found credible.

    b.  Whether the ALJ erred in evaluating the medical opinion evidence of record.

    c.  Whether the appointment of Andrew Saul violated separation of powers and rendered the decisions in this case by the ALJ and Appeals Council judges, who derive their authority from Saul, constitutionally defective.

    d.  Whether the ALJ and Appeals Council judges had legal authority to adjudicate this case if they were not properly appointed.

## V.    ANALYSIS

### 1.  Whether the ALJ erred in evaluating Plaintiff's RFC by failing to include limitations she found credible

Plaintiff contends that the ALJ failed to include limitations in the RFC determination that she found to be credible and failed to explain why she was omitting credible limitations. (Rec. Doc. No. 10-1, p. 4). Plaintiff claims that the ALJ determined that Plaintiff had mild to moderate limitations regarding her mental impairments, but despite this, the ALJ adopted "absolutely ZERO" mental limitations in her RFC and hypothetical question to the vocational expert. *Id*. at 4-6. Accordingly, Plaintiff argues that the RFC finding and hypothetical questions were defective because they failed to account for credible mental impairments. *Id*. at 6. Plaintiff notes that even non-severe impairments must be accounted for in an RFC. *Id*. at 7. Turning to physical impairments, Plaintiff contends that the RFC finding did not contain all needed limitations. *Id*. "In other words, the ALJ's RFC finding failed to adequately account for Ms. Watts' admittedly severe degenerative disc disease of the cervical spine and lumbar spine and bilateral carpal tunnel syndrome." *Id*. Plaintiff argues that the RFC finding does not contain adequate limitations, pointing to medical evidence in the record to support those limitations. *Id*. at 8-9. Specifically, Plaintiff points to a lack of limitations regarding Plaintiff's ability to perform overhead work, rotate her neck or head, maintain her head in a static position, or perform any other activities with her

arms or neck. *Id*. at 9. Finally, because the ALJ purportedly failed to explain the basis for choosing not to include potentially work preclusive limitations, Plaintiff contends that remand is required. *Id*. at 10.

The Commissioner contends that substantial evidence supports the ALJ's RFC finding that Plaintiff could perform a modified range of sedentary work. (Rec. Doc. No. 14-1, p. 18). The Commissioner argues that the ALJ did not rely exclusively on one factor when evaluating the RFC, but properly considered a range of evidence including medical records and opinions, the nature and intensity of Plaintiff's pain and other symptoms, the efficacy of medications, other treatments Plaintiff has undergone, and functional limitations. *Id*. at 19. Regarding mental impairments, the Commissioner notes that the ALJ actually included several limitations to accommodate mental impairments. *Id*. at 19-20. The Commissioner contends that the ALJ likewise incorporated those limitations into her hypothetical questions to the vocational expert. *Id*. at 20. Further, the Commissioner notes that the jobs identified by the vocational expert involve unskilled work which "needs little or no judgment to do simple duties that can be learned on the job in a short period of time." *Id*. at 21 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(g)). Regarding physical impairments, the Commissioner argues that Plaintiff has not met her burden of proving functional limitations beyond those included in the physical RFC findings. *Id*. at 21. The Commissioner points to Plaintiff's symptoms, medical history, administrative medical findings, and medical professionals' clinical findings as evidence to support the physical limitations identified in the RFC. *Id*. at 22-23.

An RFC determination describes the most an individual can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the ALJ must consider all the evidence in the record, including the limiting effects of all documented impairments, regardless

of whether those impairments are severe or non-severe. *Id.* at § 404.1545(a)(1)-(3). The relative weight given to the evidence contained in the record is within the ALJ's discretion. *Chambliss v. Massanari*, 269 F.3d 520, 523 & n.1 (5th Cir. 2001) (per curiam). To that end, the ALJ is not required to incorporate limitations in the RFC that she did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988) (per curiam). Furthermore, "RFC determinations are inherently intertwined with matters of credibility, and the ALJ's credibility determinations are generally entitled to great deference." *Acosta v. Astrue*, 865 F. Supp. 2d 767, 790 (W.D. Tex. 2012) (citing *Newton*, 209 F.3d at 459) (internal quotation omitted)).

There is no merit to Plaintiff's argument that the ALJ adopted "absolutely ZERO" mental limitations in the RFC or the questions posed to the vocational expert. The RFC explicitly includes numerous mental limitations, including finding Plaintiff can perform "simple and detailed tasks of 1-4 steps with routine supervision," "make related judgments with superficial public contact," perform work "where interpersonal contact is routine but superficial," perform tasks "that are no more complex than those learned by experience, with several variables and judgment within limits," and require little supervision "for routine tasks but detailed [supervision] for non-routine tasks." (Rec. Doc. No. 8, p. 19). The ALJ included these same limitations in her hypothetical questions to the vocational expert, stating:

> Work can be formed where interpersonal contact is routine but superficial, for example a grocery checker, where tasks should be no more complex than those learned by experience with several variables in judgment within those limits. Supervision required is little for routine tasks but detailed for non-routine tasks. She has the ability to perform simple and detailed tasks of one to four steps with routine supervision and make related judgments with superficial public contact.

(Rec. Doc. No. 8, p. 54). Moreover, as noted by the Commissioner, the jobs identified by the vocational expert in response to the hypothetical involve unskilled work which "needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R.

Pt. 404, Subpt. P, App. 2 § 202.00(g).

Here, the ALJ analyzed Plaintiff's impairments following the appropriate regulations for determining her RFC: by considering objective medical evidence; daily activities; location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment for relief of symptoms; any measures used to relieve pain; and any other factors. 20 C.F.R. § 416.929(c)(2)-(3). In her discussion of Plaintiff's mental impairments, the ALJ stated that despite subjective allegations, "the medical evidence shows her cognitive and communicative abilities were intact," she was "able to articulate her symptoms and understand and follow her treatment plans," she "reported her anxiety and ADHD symptoms were well controlled with her medications and improved function," and she "often denied depressive symptoms." (Rec. Doc. No. 8, p. 21). The ALJ then stated, "Accounting for her history of ADHD and mood fluctuations, the undersigned limits her to one to four step tasks, related judgments, and superficial interactions as described at finding four." *Id*. Thus, the ALJ specifically considered and accounted for Plaintiff's mental impairments in the RFC, and properly considered all relevant factors in reaching an RFC supported by substantial evidence.

Regarding physical limitations, Plaintiff contends the RFC finding failed to adequately account for all of the impairments that arise from her severe degenerative disc disease of the cervical spine and lumbar spine and bilateral carpal tunnel syndrome. (Rec. Doc. No. 10-1, pp. 7-8). Contrary to Plaintiff's contention, the ALJ noted medical evidence that *supported* the impairments Plaintiff alleged relevant to her degenerative disc disease and carpal tunnel syndrome. The ALJ specifically mentioned MRIs of her lumbar and cervical spine revealing multilevel lumbar spondylosis with moderate to severe foraminal stenosis at her L5-S1, as well as multilevel cervical spondylosis with mild to moderate foraminal stenosis at her C6-7. (Rec. Doc. No. 8, p.

20). During physical examinations, Plaintiff exhibited "positive [T]inel and [P]halen signs, slightly diminished grip strength, weakness in her right leg, antalgic gait, and tenderness to palpation and restricted range of motion of her cervical and lumbar spine." *Id*. Because of these findings, the ALJ "limit[ed] [Plaintiff] to sedentary work with the postural and manipulative limitations described at finding four." *Id*. at 20-21.

Despite agreeing that some limitations were required to account for Plaintiff's physical impairments, the ALJ also noted findings in which Plaintiff maintained full strength in her extremities, with sensory and motor function intact. *Id*. at 20. Further, during her recent treatment, "she reported improved pain and improved daily function with her current treatment plan." *Id*. In evaluating the Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms, the ALJ noted that they were inconsistent with the medical evidence of record, in that treatment notes indicated she responded well to conservative treatment, reported doing well overall, and denied medication side effects. (Rec. Doc. No. 8, p. 21). "Regarding her degenerative disc disease, she reported her medications improved her pain and daily function and, at times, she denied musculoskeletal pain." *Id*. Thus, the ALJ determined that the evidence in the record did not support additional limitations.

Here, the ALJ rightfully noted that Plaintiff had shown signs of improvement under her current treatment plan. "If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability." *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) (citing 20 C.F.R. §§ 404.1530, 416.930; *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987)). The ALJ then limited Plaintiff to sedentary work, which involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles "like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Sedentary work involves primarily sitting, with walking

and standing required occasionally. *Id*. The RFC includes numerous postural limitations, limiting her to "occasionally climb ramps and stairs," "never climb ladders, ropes or scaffolds," "occasionally crouch and crawl," "frequently balance, stoop and kneel," and "frequently reach overhead and frequently handle with her bilateral hands." (Rec. Doc. No. 8, p. 19). Although Plaintiff argues that a limitation to frequent "is hardly a limitation at all," a limitation to frequent limits an individual to performing these functions no more than 1/3 to 2/3 of the workday. *See* SSR 83-10, 1983 WL 31251, at *6.

Significantly, the ALJ imposed greater limitations in Plaintiff's RFC than any of the recommendations in the medical opinion evidence. Dr. Beaucoudray, Plaintiff's treating physician, did not include any limitations relevant to Plaintiff's carpal tunnel syndrome, but the ALJ noted that it "supports the addition of the manipulative limitations described at finding four." (Rec. Doc. No. 8, p. 21). Furthermore, state agency medical consultants Karen Schnute and David M. Bailey opined that Plaintiff could perform *light* work with some postural and manipulative limitations. *Id*. The ALJ determined that Plaintiff's antalgic gait "supports more restrictive exertional limitations," and limited her to sedentary work despite the state agency medical opinions.

Although Plaintiff insists the ALJ should have included even greater limitations to address her ability to perform overhead work, rotate her neck and head, and maintain her head in a static position, (Rec. Doc. No. 10-1, p. 9), substantial evidence supports the ALJ's RFC finding imposing greater limitations on Plaintiff than those recommended in medical opinions, despite Plaintiff exhibiting inconsistent symptoms and showing signs of improvement with medical treatment. Further, Plaintiff has not identified any evidence that would have changed the result, and thus, this Court will not disturb the ALJ's decision. *Brock*, 84 F.3d at 728-29 (Plaintiff "must show that he could and would have adduced evidence that might have altered the result."). An ALJ's RFC

decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports the decision or all the evidence that is rejected. *Falco v. Shalala,* 27 F.3d 16, 164 (5th Cir.1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett,* 67 F.3d at 564. Furthermore, courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir. 1988) (citations omitted). Plaintiff invites the Court to reweigh the evidence, which it is without the authority to do. Here, the RFC determination is supported by substantial evidence and there is no merit to the argument that the ALJ failed to include limitations that she found credible.

### 2. Whether the ALJ erred in evaluating the medical opinion evidence of record

Plaintiff argues that Dr. Beaucoudray, her treating physician, opined that she would be able to perform sedentary work with occasional postural activity and a sit/stand option, and that she would require unscheduled breaks and at least two absences per month. (Rec. Doc. No. 10-1, p. 12). Despite this opinion, the ALJ rejected the unscheduled breaks indicated by Dr. Beaucoudray stating that recent treatment notes did not support his findings. *Id.* Plaintiff contends that this is a "blatant mischaracterization" of the medical evidence of record as it does not consider Plaintiff's full treatment history under the care of Dr. Beaucoudray. *Id.* "The ALJ based her denial of benefits on the most recent treatment notes without addressing Ms. Watts' treatment history in its entirety." *Id.* at 13. Further, Plaintiff argues that the ALJ made no findings regarding the absences noted by Dr. Beaucoudray and did not say whether "this portion of the opinion was supported by or consistent with the evidence or record or whether it was persuasive." *Id.* In sum, Plaintiff argues

that the ALJ's failure to properly evaluate the medical opinion evidence was "absolute legal error" requiring remand. *Id*.

The Commissioner maintains that the ALJ properly evaluated Dr. Beaucoudray's opinion and incorporated several of his recommended limitations into the RFC. (Rec. Doc. No. 14-1, p. 23). The Commissioner argues that the ALJ followed the appropriate regulations in evaluating the medical opinion evidence and claims that the ALJ is not required to explain the persuasiveness or consistency of each and every limitation identified by a medical provider. *Id*. at 24. Finally, the Commissioner contends that the ALJ has provided a sufficient explanation for the persuasiveness of Dr. Beaucoudray's opinion. *Id*.

The Social Security Administration recently revised the regulations concerning agency consideration of medical opinion evidence in disability determinations. For claims filed on or after March 27, 2017, as in this case, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *accord Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (per curiam). Instead, the ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness applying five factors: (1) supportability, (2) consistency, (3) relationship with the claimant including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and extent of treatment relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *Id*. § 404.1520c(c).

An ALJ must articulate how he considered the supportability and consistency factors for a medical opinion or a prior administrative medical finding in her determination. *Id*. §

404.1520c(b)(2). However, the ALJ is not required to discuss how she considered the medical source's relationship with the claimant, specialization, or other factors in her determination. *Id*. Although the ALJ is not required to articulate how she considered each and every medical opinion contained in a medical source statement from a given medical provider, *see id.* at § 404.1520c(b)(2), the ALJ must still provide some explanation for rejecting a medical opinion of record. *See Price v. Astrue*, 401 Fed. App'x 985, 987 (5th Cir. 2010) (per curiam) (Although the ALJ does not need to comment on every piece of evidence, she must still "build an accurate and logical bridge between the evidence and the final determination."); *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000). This is so because without any explanation from the ALJ, it is impossible for the Court to determine whether the ALJ's finding is supported by substantial evidence. *See Harmon v. U.S. Comm'r*, No. 6:14-cv-02660, 2015 WL 9226138, at *7 (W.D. La. Nov. 17, 2015) (concluding reversal and remand was required where ALJ failed to explain basis of decision, making it impossible for the court to determine whether the ALJ provided the correct legal standard or whether the finding was supported by substantial evidence).

The ALJ considered Dr. Beaucoudray's opinion as follows:

> The claimant's treating physician, Troy Beaucoudray, MD, opined the claimant can perform sedentary work with occasional postural activity and a sit/stand option, and she requires unscheduled breaks and at least two absences per month (Exhibit B10F). The exertional and postural limitations Dr. Beaucoudray identified are supported by his treatment notes that indicated the claimant exhibited decreased strength in her right lower extremity, tenderness of her paraspinal muscles, and restricted range of motion of her cervical and lumbar spine (Exhibits B2F/23; B8F/7). These limitations are also consistent with the MRI findings that showed mild to moderate degenerative findings of her cervical spine and moderate to severe degenerative findings of her lumbar spine (Exhibits B3F/11; B8F/5). However, the undersigned finds that the claimant's carpal tunnel syndrome supports the addition of the manipulative limitations described at finding four. The unscheduled breaks he identified are not supported by his recent treatment notes. According to his recent treatment notes, the claimant showed improved strength and reported improved pain and better function (Exhibit B12F/2, 3).

(Rec. Doc. No. 8, p. 21). There is no merit to Plaintiff's contention that the ALJ mischaracterized

the evidence of record or committed legal error in her evaluation of medical opinion evidence. Here, the ALJ addressed both the supportability and consistency of the opinion at the source-level, as the new regulations require. Undermining Plaintiff's position, the ALJ here actually incorporated the limitations suggested by Dr. Beaucoudray where the limitations were supported by "his treatment notes" and "MRI findings," showing that she considered the entire record. *Id*. The ALJ even included *additional* limitations in her RFC *beyond* those indicated by Dr. Beaucoudray, noting that her carpal tunnel syndrome "supports the addition of the manipulative limitations described" in the RFC. *Id*. Regarding unscheduled breaks, the ALJ noted that they were not supported by recent treatment notes that showed Plaintiff had made improvements in strength and pain. Prior to evaluating the medical opinion evidence, the ALJ had noted that notwithstanding the medical findings to support limitations, Plaintiff "maintained full strength in her other extremities, and her sensory and motor function were intact… [a]dditionally, during recent treatment, she reported improved pain and improved daily function with her current treatment plan." *Id*. at 20. It is proper for an ALJ to consider any improvements from ongoing treatment. *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("A medical condition that can reasonably remedied either by surgery, treatment, or medication is not disabling.").

There is nothing in the record to support Plaintiff's argument that the ALJ failed to consider Dr. Beaucoudray's opinion that she requires at least two absences per month, nor any merit to the argument that the ALJ was required to address each opinion from one medical source. The fact that the ALJ found the opinion or portions of the opinion to be persuasive does not obligate the ALJ "to incorporate every limitation suggested by the report, nor do the regulations require the ALJ to expressly address the persuasiveness of every opinion within every report." *Moore v. Commissioner of Social Security*, 2021 WL 2834395, at *2 (N.D. Miss. July 7, 2021); *see also* 20

C.F.R. § 404.1520c ("[W]hen a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed… as appropriate. *We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually*.") (emphasis added). The ALJ is required to consider the opinions from one treating source together in a single analysis using the above factors, as the ALJ did here. *See Hill v. Soc. Sec. Admin.*, Civ. A. No. 20-2397, 2022 WL 307383, at *5 (E.D. La. Feb. 2, 2022) (citing 20 C.F.R. § 404.1520c(b)(1) ("When one medical source provides multiple opinions, the ALJ is not required to articulate how he 'considered all of the factors for all of the medical opinions,' but instead should articulate how he considered those opinions 'together in a single analysis using the factors' listed" in the regulation)); *see also Richardson v. Kijakazi*, No. 8:20-cv-1107-AEP, 2021 WL 3879049, at *4 (M.D. Fla. Aug. 31, 2021) (citing *Adams v. Comm'r*, 586 Fed.Appx. 531, 534 (11th Cir. 2014) ("the ALJ does not need to address every finding set forth by a medical source")).

Furthermore, an ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (holding that good cause exists for abandoning a treating physician's opinion where it is unsupported by the evidence). It is the role of the Commissioner, not the courts, to resolve conflicts in the evidence, and if substantial evidence supports the decision, it must be affirmed even if there is evidence on the other side. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990); *Lewis v. Commissioner of Social Security*, No. 20-345-EWD, 2021 WL 4142279, at *4 (M.D. La. Sept. 10, 2021). Here, the ALJ properly considered the medical evidence and explained her evaluation of

that evidence. Her findings are premised on the proper legal standards and are supported by substantial evidence in the record.

### 3. Whether the appointment of Andrew Saul violated separation of powers and rendered the decisions in this case by the ALJ and Appeals Council judges, who derive their authority from Saul, constitutionally defective

Plaintiff contends that the appointment of Andrew Saul as a single commissioner of the SSA who is removable only for cause and serves a longer term than that of the President violates the separations of powers, thus rendering the decision in this case by an ALJ and Appeals Council who derive their authority from Andrew Saul, constitutionally defective. (Rec. Doc. No. 10-1, p. 14). Accordingly, Plaintiff contends she has been deprived of a valid administrative adjudicatory process. *Id*. at 15. Because the ALJ's authority and the regulations and policies upon which the decision rests derived from Mr. Saul, Plaintiff contends that a presumptively inaccurate legal standard was utilized to adjudicate this disability claim. *Id*.

The Commissioner agrees that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent that it is construed as limiting the President's authority to remove the Commissioner without cause but argues that this conclusion does not support setting aside an unfavorable SSA disability benefits determination.[1] (Rec. Doc. 14-1, p. 13). The Court therefore assumes, for purposes of this decision, that the removal provision as to the Commissioner is unconstitutional.

An unconstitutional removal provision does not automatically void every action of the agency. *See Collins v. Yellen*, 141 S. Ct. 1761, 1789 (2021); *see also Hughes v. Kijakazi*, Civ. A. No. 20-2374, 2022 WL 1256704, at *19 (E.D. La. Mar. 9, 2022) (dealing with the same exact issue of the constitutionality of decisions by the ALJ and Appeals Council under Andrew Saul). To undo

---

[1] The Commissioner further argues the harmless error doctrine, the *de facto* officer doctrine, and the rule of necessity in support of its opposition to this assignment of error. The Court need not address these alternative arguments, as the Court has determined remand is not appropriate on the basis of the removal provision alone.

an agency action, the plaintiff must show that the unconstitutional provision inflicted compensable harm. *Id*. In *Collins*, the United States Supreme Court provided some examples that would clearly meet this standard:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause for removal." Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way.

*Id*. In *Collins*, the plaintiffs sought to undo certain agency action on the basis that the unconstitutional removal provision applicable to the Director of the Federal Housing Finance Agency ("FHFA") had caused harm because in the absence of the provision, the President might have removed one of the Directors who implemented the challenged agency action or the Directors might have altered their behavior in a way that could have benefitted the plaintiffs. *Id*. The Court described the question of whether the unconstitutional provision had caused harm as "less clear-cut" and held that the lower courts should resolve the parties' arguments in the first instance. *Id*.

Courts applying the *Collins* standard to the Commissioner of the SSA in the context of an appeal of a denial of Social Security benefits have found no harm that can be linked to the unconstitutional removal provision. *See, e.g., Hughes*, 2022 WL 1256704, at *20; *Dondia M.L. v. Kijakazi*, No. 2:20-CV-06497-AFM, 2022 WL 60591, at *3 (C.D. Cal. Jan. 5, 2022) (Plaintiff identifies no particular harm suffered by virtue of her claim being adjudicated during Commissioner Saul's tenure by an ALJ who was otherwise properly appointed. She has failed to show any connection between the unconstitutional removal clause and ALJ Gunn's decision denying her benefits. Further, nothing in the record supports the conclusion that the disability decision is in anyway traceable to Commissioner Saul.); *Crossley v. Kijakazi*, No. 3:20-CV-02298, 2021 WL 6197783, at *7 (M.D. Pa. Dec. 31, 2021) ("Crossley cannot show how the inability to

remove the Commissioner without cause might have affected any disability benefits decision, much less the decision on his specific claim."); *Carolyn M.D. v. Kijakazi*, No. 2:20-CV-06725-AFM, 2021 WL 6135322, at *12 (C.D. Cal. Dec. 28, 2021) ("Plaintiff has failed to show any connection between the unconstitutional removal clause and ALJ Carberry's decision denying her benefits. She identities no particular harm suffered by virtue of her claim being adjudicated during Commissioner Saul's tenure by an ALJ who was otherwise properly appointed. Further, nothing in the record supports the conclusion that the disability decision in Plaintiff's case is in anyway traceable to Commissioner Saul. Accordingly, Plaintiff cannot rely upon the unconstitutional removal clause as a basis for obtaining a new hearing."); *Tibbetts v. Comm'r of Soc. Sec.*, No. 2:20-CV-872-SPC-MRM, 2021 WL 6297530, at *6 (M.D. Fla. Dec. 21, 2021), report and recommendation adopted, No. 2:20-CV-872-SPC-MRM, 2022 WL 61217 (M.D. Fla. Jan. 6, 2022) ("The undersigned has not found any evidence suggesting that there is a connection between the removal provision and any possible harm to Plaintiff."). These courts have required the claimant to show some connection between the unconstitutional removal clause and the decision denying benefits. *Id.*

Here, Plaintiff has not made and cannot make a showing that the removal restriction caused compensable harm, or even demonstrate a connection between the removal provision and the adverse disability decision. At most, Plaintiff argues that the ALJ who adjudicated her claim and the Appeals Council members who considered her request for review served under authority delegated from a Commissioner who enjoyed unconstitutional removal protection, and thus, the denial of her claim *ipso facto* violates the separation of powers. This is incorrect based on the Supreme Court's recent ruling in *Collins*, clarifying that actions taken by properly *appointed* official are not necessarily void. *Collins*, 141 S.Ct. at 1788. Regardless of restrictions on removal,

the properly appointed Commissioner had full authority to carry out the responsibilities of his office, including promulgating regulations and delegating authority pursuant to the Act. While Plaintiff suggests that actions taken by the Commissioner and those under his leadership are void or invalid due to the unconstitutional removal provisions, "*Collins* expressly rejects this view." *Boger v. Kijakazi*, No. 1:20-cv-00331, 2021 WL 5023141, at *3 (W.D.N.C. Oct. 29, 2021).

Furthermore, as noted by the Commissioner, the ALJ who decided this case was appointed by an Acting Commissioner not subject to a removal provision, thereby removing the constitutional defect allegedly in play. Finally, the existence of an unconstitutional removal provision as to the head of an agency does not render the official impotent as would be the case with an unconstitutional appointment. *Collins*, 141 S. Ct. at 1787 (making clear that an unconstitutional *removal* provision is not the same as an unconstitutional *appointment* provision and holding that the unconstitutional removal provisions did not render actions taken by the FHFA void). To obtain relief, Plaintiff cannot rely on the removal provision alone: she must show that the removal provision harmed her. *Id*. at 1788-89. Quite simply, the fact than an ALJ or the Appeals Council derived their authority from the Commissioner is not enough. Having found that Plaintiff has not established a connection between the unconstitutional provision and the adverse disability decision, the Court finds that remand is not appropriate on the basis of the removal provision.

### 4. Whether the ALJ and Appeals Council judges had legal authority to adjudicate this case if they were not properly appointed

Finally, Plaintiff argues that remand is required because the ALJ and Appeals Council judges had no legal authority to adjudicate this case because they were not properly appointed. (Rec. Doc. No. 10-1, p. 17). Plaintiff claims that Acting Commissioner Nancy Berryhill's term ended on November 16, 2017, pursuant to the Federal Vacancies Reform Act ("FVRA"), yet she

served as Acting Commissioner until Andrew Saul was appointed on June 17, 2019. *Id*. Despite her term ending on November 16, 2017, Plaintiff claims that she appointed ALJs and Appeals Council judges on July 16, 2018. *Id*. "Because these faux appointments occurred more than 210 days after Ms. Berryhill became Acting Commissioner, she no longer had any legal authority as Acting Commissioner under the FVRA to make such appointments." *Id*. at 17-18. Plaintiff claims that none of the adjudicators of this case were properly appointed, and therefore, they lacked authority to adjudicate this disability determination. *Id*. at 18. Plaintiff points to the case of *Brian T.D. v. Kijakazi*, 2022 WL 179540 (D. Minn. Jan. 20, 2022), in which the Plaintiff raised the same arguments and the Court concluded that any actions taken by Ms. Berryhill after November 16, 2017, were unlawful. *Id*.

The Commissioner argues that Ms. Berryhill was validly serving as Acting Commissioner when she ratified and approved the appointments of the ALJs. (Rec. Doc. No. 14-1, p. 1). The Commissioner contends that the FVRA authorized Ms. Berryhill to resume her position as Acting Commissioner on April 17, 2018, when President Trump nominated Andrew Saul to be the Commissioner for the Social Security Administration. *Id*. at 3. Following her properly resuming her role as Acting Commissioner, Ms. Berryhill ratified the appointments of ALJs on July 16, 2018. *Id*. The Commissioner asks the Court to follow the line of cases that agree that 5 U.S.C. § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination, even when the nomination was submitted after the initial 210-day period for acting service has expired. *Id*. Pointing to numerous other decisions throughout the country that recognize a "spring-back" provision in the FVRA, the Commissioner argues that *Brian T.D.* is an outlier.[2]

---

[2] *Accord Donta J. v. Saul*, No. 2:20-cv-131-RGD-DEM, 2021 WL 3705145, at *7 (E.D. Va. Apr. 2, 2021), *report and*

Plaintiff's final issue on review argues that the ALJ's appointment violates the Appointments Clause of the United States Constitution. The Appointments Clause, Article II, Section 2, Clause 2 of the Constitution provides the exclusive process by which the President may appoint "officers of the United States," including those exercising powers of the Executive Branch. U.S. Const. art. II, § 2, cl. 2 ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they may think proper, in the President alone…"). The Appointments Clause divides officers into two classes – principal officers and inferior officers. *United States v. Germaine*, 99 U.S. 508, 509-11, 25 L.Ed. 482 (1879). Principal officers must be appointed by the President with the advice and consent of the Senate and are commonly referred to as PAS appointments. *NLRB v. SW General, Inc.*, 580 U.S. 288, 137 S.Ct. 929, 934, 197 L.Ed.2d 263 (2017). Because the PAS-appointment process may leave a PAS office vacant for a period of time, the Appointments Clause authorizes the President to "fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. However, not all vacancies occur during the Senate recess, and the process of Senate confirmation may necessarily leave a PAS appointment vacant. To ameliorate this, Congress has historically given the President limited

---

*recommendation adopted by* 2021 WL 2711467 (E.D. Va. Jul. 1, 2021); *Austin v. Saul*, No. 19-cv-3017-CJW, 2020 WL 5229540, at *16 n. 7 (N.D. Iowa May 12, 2020), *report and recommendation adopted by* 2020 WL 3100838 (N.D. Iowa June 11, 2020); *Heins v. Saul*, No. 19-cv-2043-LTS, 2020 WL 6052583, at *21 n. 18 (N.D. Iowa June 11, 2020), *report and recommendation adopted by* 2020 WL 4369450 (N.D. Iowa July 30, 2020); *Taylor v. Saul*, No. 1:16-cv-00044, 2019 WL 3837975, at *4 (W.D. Va. Aug. 15, 2019); *Mark F. v. Berryhill*, No. 1:18-cv-02031-MJD-TWP, 2019 WL 1055098, at *n. 2 (S.D. Ind. Mar. 6, 2019); *Vickie H. v. Berryhill*, No. 1:18-cv-00351-SEB-DLP, 2019 WL 1370700, at *n. 2 (S.D. Ind. Mar. 1, 2019), *report and recommendation adopted by* 2019 WL 1367537 (S.D. Ind. Mar. 26, 2019); *Charles K. v. Berryhill*, No. 1:18-cv-02013-JPH-DML, 2019 WL 667760, at *n. 2 (S.D. Ind. Feb. 15, 2019); *Lopez Davila v. Berryhill*, No. 17-cv-12212-ADB, 2018 WL 6704722, at *1 n. 1 (D. Mass. Nov. 6, 2018); *Patterson v. Berryhill*, No. 2:18-cv-00193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018).

authority to appoint officials to temporarily perform the functions of the vacant PAS office without Senate approval. *NLRB*, 137 S.Ct. at 935.

In an effort "to create a clear and exclusive process to govern the performance of duties of offices in the Executive Branch" that are filled through the PAS process, Congress passed the Federal Vacancies Reform Act in 1998. S. Rep. 1, No. 105-250, 105th Cong., 2nd Sess. 1998, 1998 WL 404532 (July 15, 1998) ("Senate Report" throughout). The FVRA authorizes certain officials to act during vacancies in Senate-confirmed offices. *See* 5 U.S.C. §§ 3345, 3346; *see also NLRB v. SW Gen., Inc.*, 580 U.S. 288, 137 S.Ct. 929, 197 L.Ed.2d 263 (2017). Specifically, the FVRA:

> provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required. 5 U.S.C. § 3345 et seq. The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." *Id*. § 3345(a)(1). Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers. *Id*. § 3345(a)(2)-(a)(3) … The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency. *Id*. § 3347. And violations of the FVRA have consequences: "An action taken by any person who is not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force and effect," *Id*. § 3348(d)(1), and any such action "may not be ratified," *id*. § 3348(d)(2).

*Northwest Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F.Supp.3d 31, 53 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021).

The specific provision of the FVRA at issue in this case limits how long an acting official can execute the duties of a vacant office, providing:

> (a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
>
> > (1) for no longer than 210 days beginning on the date the vacancy occurs; **or**

(2) subject to subsection (b), **once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate**.

(b)

(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the resignation, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—

(A) until the second nomination is confirmed; or

(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346 (emphasis added).

In December 2016, President Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner. *See* "Memorandum Providing an Order of Succession Within the Social Security Administration," 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo"). On January 20, 2017, Donald Trump assumed the Presidency, then-Acting Commissioner Carolyn Colvin resigned, and then-DCO Berryhill began serving as Acting Commissioner pursuant to the Succession Memo, as the offices of Commissioner and Deputy Commissioner were vacant. B-329853, "Violation of the 210-day Limit Imposed by the Vacancies Reform Act of 1998 – Commissioner, Social Security Administration," Mar. 6, 2018, at 1, https://www.gao.gov/assets/700/690502.pdf ("GAO Report" throughout). On March 6, 2018, the General Accountability Office ("GAO") reported that Berryhill's service as Acting Commissioner

under the FVRA expired on November 16, 2017, and that her service after that date violated the FVRA.[3] GAO Report, p. 2. Shortly thereafter, President Trump nominated Andrew Saul to be SSA Commissioner on April 17, 2018. (Rec. Doc. No. 14-1, p. 3). Upon the submission of his nomination, Ms. Berryhill resumed her service as Acting Commissioner until Saul took office on June 17, 2019. On July 16, 2018, Ms. Berryhill ratified the appointments of the Social Security Administration's ALJs and approved those appointments as her own.[4] *See* Social Security Ruling 19-1p, *Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council*, 2019 WL 1324866, at *2 (Mar. 15, 2019) ("SSR 19-1p").

Here, it is uncontested that Ms. Berryhill initially served under § 3346(a)(1) from January 21, 2017 until November 16, 2017, or for 210 days, at which point her authority under the subsection was terminated. (Rec. Doc. No. 10-1, p. 17). The validity of her *second* period of service, and consequently the validity of her ratification of ALJ appointments, including the ALJ who considered the instant case, is the issue before the Court.[5] The crux of the argument is whether

---

[3] The report notes that the FVRA's 210-day limitation is extended by ninety days in the year of a transitional Presidential inauguration when the vacancy existed during the sixty-day period beginning on the transitional inauguration date. 5 U.S.C. § 3349a(b). 300 days from January 20, 2017 is November 16, 2017.

[4] This action was taken in response to the United States Supreme Court decision in *Lucia v. SEC*, 138 S.Ct. 2044 (2018) holding that ALJs of the SEC were "Officers of the United States" within the meaning of the Appointments Clause and thus must be validly appointed. Further, any adjudication "tainted with an appointments violation" required a new hearing before a properly appointed official to remedy the deficient hearing. *Id* at 2055.

[5] The Court notes that no court in this circuit has issued an opinion addressing this matter directly. When this argument has arisen in the past, the majority of courts that have addressed an Appointments Clause issue relied on a Plaintiff's failure to make the constitutional challenge at the administrative level resulting in a waiver of the argument on appeal. *See, e.g., Ricks v. Commissioner of Social Security*, Civ. A. No. 18-1097-RLB, 2020 WL 488285, at *3-4 (M.D. La. Jan. 30, 2020); *Parsons v. Saul*, Civ. A. No. 4:19-cv-103-P-BP, 2020 WL 444468, at *6 (N.D. Tex. Jan. 13, 2020); *Perkins v. Berryhill*, No. 4:18-cv-664-A, 2019 WL 2997082, at *4 (N.D. Tex. June 21, 2019); *Velasquez on Behalf of Velasquez v. Berryhill*, Civ. A. No. 17-17740, 2019 WL 77248 (E.D. La. Jan. 2, 2019) ("Accordingly, I find that plaintiff has waived the Appointments Clause issue by failing to assert it before the ALJ or the Appeals Council."). However, the United States Supreme Court put an end to this argument after deciding *Carr v. Saul*, which held that exhaustion of administrative remedies for Appointments Clause challenges to ALJs who heard Social Security disability claims was not required. 593 U.S. ___, 141 S.Ct. 1352, 209 L.Ed.2d 376 (2021).

§ 3346(a)(2) contains a "spring-back" provision, thereby authorizing Ms. Berryhill to reassume the role of Acting Commissioner upon President Trump's nomination of Andrew Saul to the office on April 17, 2018. The Court is persuaded by the great weight of evidence supporting a reading of the plain text of the FVRA to indicate that Ms. Berryhill could resume her position as Acting Commissioner of the SSA after Saul's nomination.

Statutory interpretation "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (citing *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)). Where the language of the statute is plain, the inquiry ends with the language of the statute. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). If the plain text is ambiguous, the intent of the legislative assembly is to be given effect. *See Broadcasting Co. v. United States*, 319 U.S. 190, 214, 216 (1943); *see also Gundy v. United States*, 139 S. Ct. 2116 (2019). Where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd result, courts must look beyond the plain words of the statute. *United States v. American Trucking Assns.*, 310 U.S. 534, 543 (1940).

Here, the plain language of 5 U.S.C. § 3346 and its legislative history both support the interpretation that a spring-back provision enabled Berryhill's second term as Acting Commissioner. The case cited by Plaintiff in support of the argument that the FVRA does not include a spring-back provision, *Brian T.D.*, placed a significant emphasis on the word "serving" in the present tense, reasoning:

> Courts have frequently looked to Congress' choice of verb tense to interpret statutes. *Carr v. U.S.*, 560 U.S. 438, 447 (2010). When a Court is determining the meaning of an Act of

Congress, the present tense generally does not include the past. *Id*. (citing the Dictionary Act, 1 U.S.C. § 1). Congress, in enacting § 3346, used the present participle "serving," rather than the past or present perfect "served" or "has served." Section 3346(a) applies to "the person serving as an acting officer" under § 3345. By its terms, then, the section applies to the person presently serving in that capacity and not to a person who had previously served as Acting Commissioner.

*Brian T.D. v. Kijakazi*, 2022 WL 179540, at *11.

This Court disagrees that the language of 5 U.S.C. § 3346 indicates that an individual must already be serving as acting officer on the date that a nomination is made in order to *continue* to properly serve in that role. Like the Court in *Snyder v. Kijakazi*, this Court "finds that the text present in 5 U.S.C. § 3346 cross-references to 5 U.S.C. § 3345 and that it is 5 U.S.C. § 3345 of the FVRA that provides for what individual 'may serve.'" 1:21-CV-103-LRR, 2022 WL 4464847, at *19 (N.D. Iowa Sept. 26, 2022). The language at § 3346 is in the present tense, not because it serves as a limitation, "but because it relates to the individual next designated to serve pursuant to the applicable section… of the FVRA." *Id*. The actual text of the statute does not mention any requirement that a nomination be submitted within the initial 210-day period, but simply states that "*once* a first or second nomination … is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending." 5 U.S.C. § 3346 (emphasis added).

Likewise in the Middle District of North Carolina, a court noted "[c]omparison of the language of subsection (b)(1) with that of subsection (b)(2) … makes clear that the word 'serving' does not possess the talismanic significance the *Brian T.D.* court would like to assign it." *Brooks v. Kijakazi*, 2022 WL 2834345, at *18 (M.D.N.C. July 20, 2022). There, the court found that the decision in *Brian T.D.* glossed over the fact that interpreting the time limits of § 3346(a)(1) to apply only to those who had already served would render a nonsensical result, as it would make it impossible for anyone to serve. *Id*.

Again, in *Bauer v. Kijakazi*, the court reasoned:

> Subsection (a) refers to "the person serving as an acting officer as described under section 3345." Thus, "serving" is used to refer back to section 3345, which sets out who may serve as an acting officer (first assistants or certain other people directed by the President). While § 3345 provides who may serve as an acting officer, § 3346 sets the periods of time during which such persons may serve in that role. Significantly, the active verb in § 3346(a) is not serving, but "may serve": "the person … may serve" subject to the time limits set out in subsections (a)(1) and (a)(2). By using "may serve," Congress did not convey that the person had to be currently serving for the nomination rule in subsection (a)(2) to apply ("the person … may serve… once a… nomination… is submitted… from the date of such nomination    for    the    period    that    the    nomination    is    pending").

*Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917, at *5 (N.D. Iowa July 25, 2022).

Likewise, in *Lance M. v. Kijakazi*, the court declined to follow *Brian T.D.*, stating:

> *Brian T.D.* misreads the import of section 3346(a)'s prefatory language. The Magistrate Judge placed great weight on the present participle "serving," finding that "the section applies to the person presently serving in that capacity and not to the person who had previously served as Acting Commissioner." *Brian T.D.*, 2022 WL 179540, at *11. But the word "presently" does not appear in the full provision, which refers to "the person serving as an acting officer <u>as described under section 3345</u>…" 5 U.S.C. § 3346(a) (emphasis added). A court "should give effect … to every word that Congress has used in a statute." *Conn. Dept. of Income Maint. v. Heckler*, 471 U.S. 524, 530 n.15 (1985) (citing *Reiter*, 442 U.S. at 339). When this qualifying clause is properly considered, the prefatory language has nothing to do with a period of "present service." Instead, it constrains section 3346(a)'s scope    to    individuals    whose    authority    stems    from    the    FVRA.

*Lance M. v. Kijakazi*, No. 2:21-CV-628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022),

*report and recommendation adopted*, No. 2:21-Cv 628, 2022 WL 307588 (E.D. Va. July 28,

2022). To interpret 5 U.S.C. 3346(a)(2) as suggested by Plaintiff would be to find that § 3346(a)(2)

provides that no person may serve pursuant to the submission of a nomination unless they were

"continuing service." *See Snyder*, 2022 WL 446847, at *20. "The language of 5 U.S.C. §§

3346(b)(1) and 3346(b)(2) is specific, deliberate, and unambiguous, and makes clear that it

restricts office to one already serving. In stark contrast, 5 U.S.C. § 3346(a)(2) contains no such

language and at no point indicates that such service is deemed a 'continuing' service." *Id*.

Furthermore, despite it being clear based on the text of the statute that the FVRA includes

a spring-back provision, a Senate Report, referenced prior, accompanied the bill, and stated that if the initial time limitation triggered by the vacancy passed, an alternate period of service would be triggered upon the submission of a nomination. *See* Senate Report 105-250, 14 (1998). The Senate Report provided that during the period between expiration of the initial term in office and the submission of nomination the office would remain vacant. *Id*. at 18. Significantly, the proposed language of § 3346(a)(2) of the FVRA, which accompanied the Senate Report, was identical to the language ultimately adopted and is also identical to the language considered herein. *Id*. at 25. Here, the legislative intent was explicitly stated in the Senate Report, and the intent was to provide an additional period of service upon submission of a nomination, even if the initial 210-day term had expired.

Accordingly, this Court declines to follow the reasoning outlined in *Brian T.D.* and joins the great weight of authority on this matter in reaching its conclusion.[6] Berryhill was appropriately serving as Acting Commissioner when she ratified the appointments of the SSA ALJs on July 16, 2018, following President Trump's nomination of Andrew Saul to the role. Therefore, remand is not required.

## VI.    CONCLUSION

Accordingly,

**IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, the Commissioner's cross-motion be **GRANTED**, and Plaintiff's case be **DISMISSED WITH PREJUDICE**.

---

[6] In addition to those cases cited and discussed herein, *see also e.g., Smoak v. Kijakazi*, Civ. A. No. 5:22-CV-7-KDB, 2022 WL 4590584 (W.D.N.C. Sept. 29, 2022); *Sidney M. v. Kijakazi*, No. C21-2034-LTS, 2022 WL 4482859 (N.D. Iowa, Sept. 26, 2022); *Jamie K. v. Kijakazi*, 8:21-CV-373, 2022 WL 3577013 (D. Neb. Aug. 19, 2022); *Mia S. v. Kijakazi*, 8:21-CV-439, 2022 WL 3577023 (D. Neb. Aug. 19, 2022); *Taylor v. Kijakazi*, 1:21CV648, 2022 WL 4668273 (M.D.N.C. Aug. 2, 2022); *Williams v. Kijakazi*, Civ. No. 1:21-CV-141-GCM, 2022 WL 2163008 (W.D.N.C. June 15, 2022); Thomas *S. v. Comm'r*, No. C21-05213-MAT, 2022 WL 268844, at *3 (W.D. Wash. Jan. 28, 2022).

## NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within fourteen (14) days after being served with a copy of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b). A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions accepted by the district court, except upon grounds of plain error.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 18th day of November, 2022.

_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**